IN THE UNITED
STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 19-cv-02266-RBJ

LARRY FAHRENBRUCH, by and through his conservator Darin Baehr of Pinnacle Bank,

     Plaintiff,

v.

JOSEPH PEETZ, D.O.,
HIGHLINE SOUTH AMBULATORY SURGERY CENTER, LLC, and
HUMANA INSURANCE COMPANY

     Defendants.

---

## ORDER ON DEFENDANT HIGHLINE'S MOTION FOR SUMMARY JUDGMENT AND ON PLAINTIFF'S MOTION FOR SPOLIATION SANCTIONS

---

     This is a medical malpractice case stemming from a patient who went into cardiac arrest during spinal surgery, and whose cardiac arrest apparently went undetected by both the anesthesia devices and healthcare professionals in the room. There are two motions before the Court: defendant Highline's motion for summary judgment [ECF No. 62], and plaintiff's motion for spoliation sanctions against both defendants [ECF No. 61]. Both motions are DENIED.

## I. FACTUAL BACKGROUND

     Plaintiff Larry Fahrenbruch is a former resident of Colorado who suffered from heart issues and required spinal cord surgery prior to the events in this case. ECF No. 7 at ¶5. Defendant Highline South Ambulatory Surgery Center, LLC ("Highline") is a multi-specialty outpatient surgery center that provides surgical suites and equipment for physicians to use during

patients' care. *Id.* at ¶12. Defendant Joseph Peetz, D.O. is an anesthesiologist who worked in anesthesia at Highline (though he was not employed by Highline) during the events of this case. *Id.* at ¶¶4, 9. At the time of the procedure, Peak Anesthesia employed Dr. Peetz, and he had no ownership interest in Highline. ECF No. 63-1 at 16:18-20. The Court outlines the relevant facts from the record and notes factual disputes where they exist.

### A. Plaintiff's background

Plaintiff had a medical history that included eight back surgeries and one sinus surgery. He also had a history of syncope, the medical term for fainting. ECF No. 61-1 at 59:8-16. Though not determined conclusively it is believed that plaintiff suffered from vasovagal syncope, which occurs when the body reacts to certain triggers like the sight of blood, and a sudden drop in heart rate and blood pressure cause a momentary loss of consciousness. A person who faints in this way typically regains consciousness on his or her own without medical intervention (e.g., CPR or injection of epinephrine). ECF No. 61-1 at 10:17-20, 74:14–75:11.

Plaintiff had no history of cardiac arrest. However, he did have a pacemaker device to control his heart rate and function. ECF No. 61-2 at 3. It was set to keep his heart rate above sixty beats per minute. ECF No. 61-1 at 40:25–41:8. On July 28, 2017 Dr. Michael J. Gesquiere performed a trial spinal cord stimulator implant on plaintiff at Highline. ECF No. 61-2 at 1–2. Dr. Peetz was the anesthesiologist during that procedure, which was uneventful. *Id.* Plaintiff was then scheduled for another spinal cord simulator implant on August 11, 2017. *Id.* at 5.

### B. The surgery on August 11, 2017

As with the first spinal cord stimulator implant, for the August 11 procedure Dr. Gesquiere operated on plaintiff, and Dr. Peetz served as the anesthesiologist. *Id.* Dr. Matthew

Eckermann was the assistant surgeon. *Id.* Medical staff positioned plaintiff facedown on the operating table. To keep the implant area as sanitized as possible, drapes were drawn across plaintiff's body. As a result, the physicians could not see the upper half of his body. *Id.* at 6.

Dr. Peetz provided monitored anesthesia care to plaintiff. He testified that he checked the anesthesia equipment on the morning of August 11, 2017 in accordance with Highline's anesthesia care protocol. His checks "did not indicate any dysfunction." ECF No. 62-5 at 48:1-5. Dr. Peetz placed the following monitoring equipment on Mr. Fahrenbruch: a pulse oximeter on a fingertip, a blood pressure cuff on an upper arm, EKG leads on his chest, and an end tidal $CO_2$ monitor through his nose. *Id.* at 38:6-13. These devices were connected to a monitor, which displays a patient's vitals on one screen. ECF No. 61-2 at 10–11. The record does not mention whether the monitor parameters were set to account for plaintiff's pacemaker.

Due to the placement of the drapes, only Dr. Peetz could see the anesthesia monitor's display. As far as anyone is aware, the anesthesia machine and monitor continuously monitored plaintiff's vital signs. Dr. Peetz testified that he believed the monitor displayed accurate vital signs throughout the procedure. ECF No. 61-5 at 38:18-23; 65-5 at 89:2-17. Dr. Peetz recorded plaintiff's vitals as displayed during the procedure onto an anesthesia record by hand. ECF No. 61-2 at 4. He wrote the EKG as Sinus Rhythm, end tidal $CO_2$ as a "+", and wrote blood pressure readings in five-minute intervals (as frequently as the blood pressure cuff measured). *Id.* As explained below, only Dr. Peetz's handwritten records of plaintiff's vitals survive. The records that the anesthesia monitor automatically generated have been lost, so there is no way to confirm whether Dr. Peetz's notes are accurate. Dr. Peetz cannot remember to what he set the pulse rate alarm limits on the monitor during plaintiff's procedure. ECF No. 61-4 at 82:4-15.

Anesthesia began at 10:34 am, and the surgery began at 11:00 am.  *Id.*  Dr. Gesquiere placed the spinal cord stimulator leads into plaintiff.  Between 12:00 pm and 12:15 pm the doctors woke plaintiff to check his pain level.  ECF No. 61-4 at 104:4-9.  No one noted anything strange or wrong at that point.  ECF No. 61-2 at 6.  Dr. Gesquiere completed the implant and then left the operating room ("OR") after the leads and battery were implanted.  ECF No. 61-6 at ¶¶2–3.  Assistant surgeon Eckermann closed plaintiff's wound.  ECF No. 61-7 at 26:3-11.

After removing the drapes back post-closure, Dr. Eckermann and Dr. Peetz realized something was wrong with Mr. Fuhrenbruch.  They saw that plaintiff was ashen, a clinical term for someone whose skin is grey due to a lack of oxygen in their blood.  ECF No. 61-2 at 6.  Dr. Peetz noted this on the anesthesia record.  ECF No. 61-3.  The OR staff rolled plaintiff over onto his back and realized that he had no pulse.  ECF Nos. 61-10 at 27:6-9; 65-9 at 70:10-13.  Nurse Helmut Krull, who was in the OR, went to get IV fluid.  ECF No. 61-8 at 11:19-20.  Dr. Peetz gave plaintiff Narcan, a reversal agent for opiates such as the fentanyl that was administered as an anesthetic.  He also gave plaintiff two doses of epinephrine.  ECF No. 61-2 at 4.

Two other nurses, Nurse Rebecca Hopkins and Nurse Hayley Hyde, followed Nurse Krull back into the OR.  ECF No. 61-8 at 11:23–12:3.  Nurse Hyde felt no pulse in plaintiff's carotid artery and began chest compressions.  ECF No. 61-10 at 27:6-12.  Nurse Hyde sent Nurse Hopkins to get the crash cart.  Nurse Hopkins returned to the OR with the crash cart after a minute or so and began to document the code, noting at 1:00 pm that CPR was in progress.  ECF Nos. 61-8 at 23:5-11; 61-2 at 9.  An unknown medical student also helped perform CPR.  ECF No. 61-12 at 17:21–18:14.  Medical staff used a Zoll brand defibrillator in an attempt to revive plaintiff.  ECF Nos. 61-2 at 9; 61-3 at 2.  Nurse Krull documented notes from the CPR and

revival procedure on a piece of paper. ECF No. 61-11 at 67:1-7. Nurse Hyde transferred these notes to a code sheet but does not remember what happened to the notes after that. ECF Nos. 64-4; 64-5 at 30:12-19, 36:25–37:3. The digital notes from the Zoll defibrillator have also been lost.

At 1:02 pm EMS was dispatched to Highline for a cardiac arrest. EMS arrived around 1:06 pm and transported plaintiff to Littleton Adventist Hospital. ECF No. 61-13 at 1, 7. Nurse Hyde documented that plaintiff's pulse returned at 1:06 pm. ECF No. 61-2 at 9. As a result of the lack of oxygen and cardiac arrest, Mr. Fahrenbruch suffered a permanent brain injury that will require daily medications, treatment, and therapy for the rest of his life. ECF No. 7 at ¶71.

After the ambulance transported plaintiff, healthcare staff at Highline cleaned the OR, a process which includes wiping down surfaces, sterilizing surgical equipment, mopping the floor, and putting the anesthesia monitors in standby mode. ECF No. 61-12 at 28:14–30:16. About twenty to thirty minutes after plaintiff's transport Dr. Peetz went back into the OR to retrieve the monitoring data. He testified that the anesthesia machine and monitor were already turned off, and the data lost. ECF No. 61-4 at 84:17-25. It is unknown who turned off the machines.

The devices that monitored plaintiff's pulse, hearth rhythm, and oxygen levels are meant to alarm if a patient's vitals drop—as would be expected before plaintiff turned ashen due to lack of oxygen and cardiac arrest. ECF No. 61-2 at 11–16. However, no one in the OR reported hearing any alarm from the anesthesia machine or monitor during the August 11, 2017 surgery. Nurses Hyde and Hopkins, who were at the nurse's station outside the OR and would have heard a code alarm sounding, also did not hear any alarm. ECF Nos. 61-8 at 12:15–13:5; 62-5 at 41:10–42:18; 62-7 at 41:20-24. Dr. Peetz noted on the Anesthesia Record that the "vital signs were within normal limits through care." ECF No. 61-2 at 4.

The parties present a variety of conflicting medical explanations regarding how and why plaintiff lost enough oxygen to become ashen, and how long that process could or did take. Dr. John Buckner, one of defendants' experts, opined that "pulseless electrical activity from a vasovagal event," i.e., fainting due to a type of heart attack, was the only possible explanation given that the medical records did not show a drop in plaintiff's vitals. ECF No. 61-1 at 57:18-23. Defendant Dr. Peetz testified that given plaintiff's underlying medical conditions, he could have become cyanotic (ashen) in "less than a minute, a handful of seconds." ECF No. 61-4 at 87:3-11. In theory this would not contradict the vital numbers recorded on his anesthesia log.

Plaintiff's experts, however, opined that a fainting episode causing Mr. Fahrenbruch to go ashen in a matter of seconds is impossible. Anesthesiologist Dr. Domson wrote in his report that plaintiff was without oxygen for at least a couple of minutes, that he likely suffered a pulseless electrical activity ("PEA") arrest, and that "the vital signs recorded by Dr. Peetz during the case are not medically possible." ECF No. 65-4 at 2–3. Dr. Chitra Venkatasubramanian, a Clinical Professor of Neurology at Stanford University, also opined that plaintiff had suffered a PEA arrest, and that he was without sufficient oxygen delivery to his brain for at least seven to eight minutes. ECF No. 65-11 at 3. Meanwhile Dr. Raymond Magorien, a physician in internal medicine and cardiology, stated that plaintiff's code event was most likely a respiratory arrest leading to PEA arrest, and that turning ashen is a process that takes "minutes, not seconds." ECF No. 65-10 at 3.

## C. The Mindray machine

There are two primary devices at issue in this case: an anesthesia machine and its attached monitor. Both are produced by Mindray. Highline purchased the Mindray A3

Anesthesia Machine and Mindray Passport 12 Patient Monitor on November 10, 2016. This anesthesia equipment was used in the OR during plaintiff's August 11, 2017 procedure. ECF No. 62-1. Dr. Peetz testified that the Mindray machines alarm when a patient's vitals are outside the "normal" range inputted into the machine. For patients with pacemakers, the Mindray manual indicates that an option labeled "Paced" must be set to "Yes," because if it is incorrectly set to "No" the monitor could fail to alarm when the ECG signal is too weak. ECF No. 62-2. The anesthesia machine and monitor digitally record vital signs data during any procedure in which the devices are accurately used. Those data can be transferred to a USB drive or printed. ECF No. 61-2 at 15–18.

Highline has an "Anesthesia Care Protocol Policy" that says anesthesia providers will check the anesthesia machines, medications, equipment, and supplies to be used for the scheduled cases daily. ECF No. 62-4 at 1. The policy also states that anesthetic equipment must be "inspected, tested, and made serviceable by the Anesthesia Provider before induction." *Id.* The parties impliedly agree that as the entity that owns and maintains the devices, Highline bears some responsibility for ensuring the anesthesia machine and monitor—which it provides to physicians and staff for use during procedures—are operating properly. *See* ECF Nos. 62 at 12–13 (arguing that Highline adequately maintained and tested the devices); 65 at 11 (arguing Highline had a duty to provide functional monitors). However, the parties dispute how often Highline should test that the devices work properly. Highline's policy states that the devices must be tested at least annually. ECF No. 62-4 at 1. Plaintiff's expert Nurse Beverly Kirchner, meanwhile, testified that the anesthesia equipment is tested every three months. ECF No. 61-5 at 25:12-21.

Defendant Highline did not test the equipment every three months.  Instead, the devices were tested about once every six to twelve months.  The Mindray technician that installed both devices on November 18, 2016 also performed a functional test, which both devices passed.  ECF No. 62-2.  On April 7, 2017, four months prior to the August 11 procedure, a technical representative from Bell Medical, Inc. performed a second functional test of the devices.  Her report did not identify any issues with either device's functionality.  ECF No. 62-3.  On February 21, 2018, Angela Kuschel of HSS Inc. performed a check of the monitor in accordance with its preventive maintenance schedule.  Ms. Kuschel found no issues with the monitor and it passed the inspection.  ECF No. 62-8.

Despite all these passing results, Nurse Debra Yoder testified that the regular tests of the devices would not, to her knowledge, reveal issues with the alarm functionality even if there were any.  The only way to know if the alarms are working properly is to actually have a person connected to the machine and monitor whose vitals go outside the "normal" ranges (such as low blood pressure or high heart rate) to which the devices are set.  ECF No. 65-15 at 74:2-18.

Prior to plaintiff's August 11, 2017 procedure, Highline received no complaints regarding the Mindray devices and was not aware of any potential issues with their alarm capabilities.  The anesthesia machine and monitor were never taken out of service for repair from the date of installation in 2016 through mid-2020.  ECF No. 62-7 at 39:17-20, 41:3-14.

## II. PROCEDURAL BACKGROUND

Plaintiff, by and through his conservator Darin Baehr of Pinnacle Bank, filed this case on August 8, 2019 and filed an amended complaint towards the end of that same month.  ECF Nos. 1, 8.  In addition to suing Highline and Dr. Peetz, plaintiff also originally sued Dr. Gesquiere, the

surgeon in charge of the procedure that led to this lawsuit. *Id.* Humana Insurance Company

joined the lawsuit based on its subrogated claim on October 16, 2019. ECF No. 35. On June 9,

2020 the Court dismissed defendant Gesquiere on a motion stipulated by plaintiff. ECF No. 50.

Plaintiff moved for spoliation sanctions against the two remaining defendants on April 8, 2021.

ECF No. 61. The next day defendant Highline moved for summary judgment. ECF No. 62.

Both motions are ripe for the Court's review. *See* ECF Nos. 63, 64, 65, 67, and 68.

## III. STANDARD OF REVIEW

A court may grant summary judgment if "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The

moving party has the burden to show that there is an absence of evidence to support the

nonmoving party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The

nonmoving party must "designate specific facts showing that there is a genuine issue for trial."

*Id.* at 324. A fact is material "if under the substantive law it is essential to the proper disposition

of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is genuine if "the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson*, 477 U.S. at 248. The court will examine the factual record and make reasonable

inferences in the light most favorable to the party opposing summary judgment. *See Concrete

Works of Colo., Inc. v. City and Cty. of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).

## IV. ANALYSIS

### A. Defendant Highline's motion for summary judgment

Defendant Highline moves for summary judgment on the single claim against it—direct

negligence. In his complaint plaintiff alleges that Highline failed to: provide appropriate oversight regarding facility procedures; review applicable changes in standards of care; ensure its policies and programs were administered to provide quality and safe healthcare; ensure proper surgical monitor maintenance; and ensure the surgical monitors were functioning properly. ECF No. 7 at 11. However, the crux of his case against Highline relates only to its purported failure to maintain the anesthesia devices and ensure that they were properly operational. *See* ECF No. 65 at 11. I therefore focus my analysis on those allegations.

Plaintiff and defendant both treat the claim against Highline as a medical malpractice one, citing primarily medical malpractice cases. *See, e.g.*, ECF No. 62 at 11–12 (citing to *Melville v. Southward*, 791 P.2d 383, 387, (10th Cir. 2007) and *Gallardo v. United States*, 753 F.3d 865, 870–71 (10th Cir. 2014)); ECF No. 65 at 9 (citing *Melville*, 791 P.2d at 387). But the claim is actually one of direct negligence. As Highline itself argues, plaintiff cannot sue Highline for medical malpractice due to the corporate practice of medicine doctrine. ECF No. 62 at 11; *see also Daly v. Aspen Ctr. For Women's Health, Inc.*, 134 P.3d 450, 452–53 (Colo. App. 2005). Colorado courts thus analyze claims for direct negligence against a hospital or other healthcare entity under the general elements of negligence. *E.g.*, *Camacho v. Mennonite Bd. of Missions*, 703 P.2d 598, 600 (Colo. App. 1985) (assessing a claim against a hospital for failing to abide by and enforce its rules and regulations under a regular negligence, not medical malpractice, standard); *Steven Blanco, Sr. v. HCA-healthone, LLC*, No. 19-CV-00928-PAB-SKC, 2020 WL 5760452, at *4 (D. Colo. Sept. 28, 2020) (analyzing allegations that hospital failed to have proper diagnostic and treatment equipment and procedures under elements of direct negligence, not medical malpractice).

The elements of negligence are (1) the defendant owed a legal duty of care to the plaintiff; (2) the defendant breached that duty; (3) the plaintiff was injured; and (4) the defendant's breach caused the injury. *Vigil v. Franklin*, 103 P.3d 322, 325 (Colo. 2004). To survive summary judgment, plaintiff must present enough evidence to create genuine disputes of material fact under the contested elements. The first element is not in dispute here. Highline had a duty to properly maintain the anesthesia devices, including the monitor, and to ensure that they worked correctly. Evidence showing that Highline purchased the devices and thus owned them, that it had policies and procedures regarding their use and maintenance, and that it had them tested on numerous occasions, demonstrates this duty. The third negligence element, that plaintiff was injured, is also not in dispute. He suffered a cardiac arrest during a surgical procedure that left him with permanent brain damage. The two disputed elements are thus whether Highline breached its duty, and whether the alleged breach caused plaintiff's injuries.

     1. Res ipsa loquitur

Before addressing whether plaintiff has come forth with sufficient evidence under each disputed negligence element, I address whether res ipsa loquitur applies to this case. Plaintiff invokes the doctrine of res ipsa loquitur because he lacks direct evidence of Highline's negligence. "[I]n order to establish a prima facie case of res ipsa loquitur under Colorado law, the plaintiffs must establish that (1) the event is the kind which ordinarily does not occur in the absence of negligence; (2) possible causes other than the defendant's negligence are sufficiently eliminated; and (3) the indicated negligence was within the scope of the defendant's duty to the plaintiff." *Hartnett v. O'Rourke*, 69 F. App'x 971, 979 (10th Cir. 2003) (unpublished) (citing *Holmes v. Gamble*, 655 P.2d 405, 408 (Colo. 1982)). "A former element which required that

plaintiff establish the absence of both contributory negligence on her part and other causes has been eliminated." *Spoor v. Serota*, 852 P.2d 1292, 1295 (Colo. App. 1992) (citing *Montgomery Elevator Co. v. Gordon*, 619 P.2d 66 (Colo.1980)). Nonetheless, "[w]hen it can, with equal reasonableness, be inferred that the accident in question was due to another cause than the negligence of the defendant, the doctrine cannot be invoked." *Hartnett*, 69 F. App'x at 980 (quoting *Bettner v. Boring*, 764 P.2d 829, 832 n.2 (Colo. 1988)).

Whether a plaintiff's evidence is sufficient to warrant application of res ipsa loquitur is a question of law for the trial court. *Miller v. Van Newkirk*, 628 P.2d 143 (Colo. App. 1981). That determination is fact dependent. "Thus, if facts material to such questions are disputed, these issues may not be determined [] upon motion for summary judgment . . . ." *Greenwell v. Gill*, 660 P.2d 1305, 1308 (Colo. App. 1982) (citing *Jones v. Dressel*, 623 P.2d 370 (Colo. 1981) and *Van Schaack v. Phipps*, 558 P.2d 581 (Colo. App. 1976)).

Plaintiff argues that the res ipsa loquitur doctrine properly applies because the alarms on the anesthesia devices did not properly function despite plaintiff's loss of oxygen, and the drop in vitals he presumably would have suffered as a result. ECF No. 65 at 11–12. Plaintiff's position is that this is the type of event that does not occur without negligence. He also contends that Highline had exclusive control over the devices, and that plaintiff himself was unconscious and thus could not have contributed to the devices' alleged malfunctioning. *Id.* at 13.

The Court agrees that res ipsa loquitur applies to this case. Though Dr. Peetz suggests that the events here—plaintiff going ashen due to cardiac arrest and oxygen loss without the anesthesia devices alarming—could occur without negligence, this seems unlikely. One of plaintiff's experts opined that Dr. Peetz's explanation was "not supported by any medical

science," and all three agreed that it would take at least a couple minutes for plaintiff to become ashen—and thus the recorded vital signs could not match his actual condition when he coded. ECF No. 65-4 at 2. Even defendants' expert Dr. John Buckner was unaware of a case like this in the medical literature. ECF No. 65-16 at 9:6–10:20. It thus seems far more likely to the Court that either a malfunction of the anesthesia devices (potentially due to Highline's failure to test or maintain them), or error by Dr. Peetz, or some combination, caused plaintiff's injury.

Highline argues that res ipsa loquitur cannot apply because plaintiff has not eliminated other potential causes of his injuries. I disagree that this makes the doctrine inapplicable. The rule requires that other causes be "sufficiently eliminated," not completely eliminated. As a result, "the plaintiffs need not eliminate every possible cause other than the defendant's negligence." *Hartnett*, 69 F. App'x at 979 (citing *Ravin v. Gambrell By & Through Eddy*, 788 P.2d 817, 822 (Colo. 1990)). Here, the primary other possible explanation is the negligence of another defendant, Dr. Peetz. Highline had exclusive control over the anesthesia devices with respect to their testing and maintenance, while Dr. Peetz exercised exclusive control over the devices during the August 11, 2017 procedure.

Normally res ipsa loquitur applies when there is a single defendant, and that defendant has exclusive control over the instrumentality purportedly causing the harm. However, Colorado courts have also applied res ipsa loquitur when, as here, there are multiple defendants whose potentially negligent acts alternately explain plaintiff's injury. For example, in *Kitto v. Gilbert* the Colorado Court of Appeals ruled that a res ipsa instruction should have been given when, during an eye surgery, a doctor and an anesthesiologist both controlled an anesthesia machine determined to be the cause of the plaintiff's harm. 570 P.2d 544, 548–49. (Colo. App. 1977).

The court held that "it is sufficient to show, as was done here, that at the relevant time, the instrumentality was under the control of no person who was not a defendant or an employee of a defendant." *Id.* at 549. *See also La Rocco v. Fernandez*, 277 P.2d 232, 235–36 (Colo. 1954) (finding res ipsa loquitur applicable where multiple driver-defendants were involved in collision causing plaintiff's death).

There is enough evidence at this summary judgment stage for me to draw inferences in plaintiff's favor regarding res ipsa loquitur. I will make a final ruling on whether to give a res ipsa loquitur jury instruction based on plaintiff's actual presentation of the evidence at trial.

    2. <u>Breach of duty</u>

Moving to the elements of negligence, defendant Highline first argues that plaintiff has not presented a prima facie case of breach. Highline argues that plaintiff was required to present expert testimony of breach of duty but did not do so. Typically, expert testimony is required to establish the reasonableness of a party's conduct where the standard of care is not within the common knowledge of the ordinary juror. *Am. Fam. Mut. Ins. Co. v. Allen*, 102 P.3d 333, 343 (Colo. 2004) (addressing necessity of expert testimony in the insurance context). "[C]ases alleging negligence based on the doctrine res ipsa loquitur generally do not require plaintiffs to produce expert witnesses." *Greenwell*, 660 P.2d at 1307 (citing *Mudd v. Dorr*, 574 P.2d 97 (Colo. App. 1977)). However, Colorado has followed the majority of other jurisdictions in holding that in some instances negligence may be established by expert testimony even when res ipsa loquitur applies. *Id.*; *see also Holmes v. Gamble*, 624 P.2d 905 907 (Colo. App. 1980).

I have already found above that res ipsa loquitur applies to this case. I nonetheless agree with Highline that expert testimony is required for Mr. Fahrenbruch to prove his claim against

Highline. The main issue for this claim is whether Highline's conduct in testing and maintaining the anesthesia devices fell below the relevant standard of care. It would be obvious to a juror that something went wrong during plaintiff's procedure. But it is not obvious what standard of care Highline had to follow regarding testing and maintenance of the anesthesia devices, such as how frequently it had to test them, how testing should be done, who should test them, etc.

I find that plaintiff has come forth with sufficient evidence of breach, including expert testimony, to create a factual dispute rendering summary judgment inappropriate. Plaintiff's expert Nurse Lisa Nagle opined that Highline deviated from the standard of care by failing to ensure its anesthesia policies were followed, failing to ensure plaintiff's pulse oximetry was continuously monitored, and failing to ensure the anesthesia devices' alarms were properly set and operating. ECF No. 65-1 at 3–4. This contrasts with the expert opinion of defendants' expert Nurse Debra Yoder who stated that Highline acted reasonably and within the standard of care for an ambulatory surgery center. ECF No. 62-10 at 1, 3. The disagreement between these experts creates a dispute of material facts that must go to a jury.

Highline urges me to reject Nurse Nagle's opinion outright because she did not criticize its policies and procedures as written, she "incorrectly applied a 'best practices' standard in her opinions," and her report was based on speculation and conclusory opinions drawn from insufficient facts. ECF No. 62 at 12. I disagree and will not reject Nurse Nagle's opinion based on these reasons. Nurse Nagle's failure to criticize Highline's policies and procedures does not mean her opinion provides no evidence of breach—she focuses instead on the failure to follow policies and procedures, which is justifiable given the allegations against Highline. Furthermore, it is not clear from the record that Highline's policies and procedures address all its conduct

allegedly falling below the standard of care. Thus, for at least some of the allegations against Highline, it is likely irrelevant how its policies and procedures are written. This criticism goes to the weight and credibility of Nurse Nagle's opinion, and Highline may address it at trial.

Further, Highline's contention that Nurse Nagle applied the incorrect standard of care is unsupported. Throughout her report Nurse Nagle references a "standard of care" to which she compares Highline's conduct. *See* ECF No. 65-1. The "best practices" line Highline references appears in her deposition, where she explains that when doing a medical record review she would "summarize the case," "give [her] opinion," "look at best practice and identify to [her] best capability if there was a break in best practice." ECF No. 62-9 at 38:25–39:5. She does not "admit" that she used the wrong standard. Nothing in her report or deposition indicates to the Court that this expert used the wrong standard in professing her opinions, nor has Highline pointed to any authority indicating this is the case. The only cases it cites are ones addressing medical malpractice. *See Melville*, 791 P.2d 383; *McGraw v. Kerr*, 128 P. 870 (Colo. App. 1912). If Highline takes issue with Nurse Nagle's not explicitly using the term "*reasonable* standard of care" in her report, it may question her on this at trial—it goes to weight and credibility. If Highline objects to Nurse Nagle's entire opinion on this basis, then that is a *Daubert* issue that it should raise in a motion and/or hearing.

Finally, I disagree that Nurse Nagle's opinion is based on insufficient facts. She reviewed and relied on largely the same set of documents as Highline's own expert, Debra Yoder, such as witness depositions, plaintiff's medical records from Highline, and Highline's policies and procedures relating to anesthesia. *See* ECF Nos. 65-1 at 2; 62-10 at 1–2. This too goes to the weight and credibility of Nurse Nagle's expert opinion and can be raised at trial.

In addition to Nurse Nagle's opinion, plaintiff has presented evidence creating a factual dispute regarding the frequency with which defendant Highline should have been testing the anesthesia devices. While Highline's policy states that all anesthesia monitoring machines will be tested no less than annually, Nurse Kirchner (who appears to be either a present or former Highline employee) testified that the anesthesia equipment at Highline was tested every three months. Highline insists that it met its own testing requirements, yet the record shows it did not test every three months, and that devices had not been tested for over four months prior to plaintiff's August 11, 2017 surgery. This is thus a dispute that goes to the heart of the claim against Highline—the standards for testing and maintaining the devices and whether it met them. Viewing the evidence in the light most favorable to plaintiff, I find that there is a genuine factual dispute about whether Highline breached its duty to Mr. Fahrenbruch.

    3. <u>Causation</u>

Defendant Highline's second argument for summary judgment is that plaintiff has presented no evidence of causation. To prove causation in a negligence case,

> [T]he plaintiff must show by a preponderance of the evidence that the injury would not have occurred but for the defendant's negligent conduct. The existence of a causative link between the plaintiff's injuries and the defendant's negligence is a question of fact, and it is within the province of the fact-finder to determine the relationship between the defendant's negligence and the plaintiff's condition, as long as the evidence establishes "such facts and circumstances as would indicate with reasonable probability" that causation exists. To create a triable issue of fact regarding causation in a medical malpractice case, the plaintiff need not prove with absolute certainty that the defendant's conduct caused the plaintiff's harm, or establish that the defendant's negligence was the only cause of the injury suffered. However, the plaintiff must establish causation beyond mere possibility or speculation.

*Kaiser Found. Health Plan of Colorado v. Sharp*, 741 P.2d 714, 719 (Colo. 1987) (internal citations omitted). Highline argues that there is no factual dispute as to causation because

plaintiff has not disclosed any expert testimony indicating that Highline's actions or inactions caused plaintiff's injuries. I disagree.

Highline asserts that Nurse Nagle admitted she was not qualified to render an opinion on causation, and that resultantly plaintiff has come forth with no expert testimony on the matter. But Highline again mischaracterizes Nurse Nagle's testimony. When asked whether she was "asked to render a causation opinion in this case," Nurse Nagle merely replied, "I don't believe it was labeled causation." ECF No. 62-9 at 38:22-25. These are not the same thing. And indeed, in her report Nurse Nagle does express an opinion on causation. After outlining how she believed Highline deviated from the standard of care, she wrote, "[i]t is my formal opinion that Highline South Surgery Center failed to follow the standard of care and *as a result* Mr. Fahrenbruch went into undetected cardiac arrest." ECF No. 65-1 at 5 (emphasis added).

Furthermore, two of plaintiff's other experts—Dr. Domson and Dr. Magorien—were endorsed to opine on causation. Each of them mentioned as part of their analysis that the monitors should have alarmed given plaintiff's condition. *See* ECF Nos. 65-4 at 2 [Domson Report] ("[A]nesthesia monitoring equipment at use in Mr. Fahrenbruch's procedure would have alarmed based on [his] outcome."); 65-10 at 3 [Magorien Report] ("Monitors used during surgical procedures should have alerted the OR that Mr. Fahrenbruch had dangerously abnormal signs . . . ."). Dr. Domson also concluded that "the nurse's testimony that they never heard an alarm indicates that the alarms were not utilized, not operational or ignored by the team." ECF No. 65-4 at 3. This is sufficient evidence to suggest that improper functioning of the monitors, due to Highline's failure to adequately test or maintain them, could have caused plaintiff to be without oxygen for a substantial amount of time and thus to sustain significant injuries.

Highline urges me to reject plaintiff's expert testimony because each expert infers or presumes that plaintiff's ashen coloration could not have occurred had the monitor alarms functioned. In support of its position Highline notes that "proof of a bad result is of itself no evidence of negligence," *McGraw*, 128 P. at 874, and asserts that the experts fail to acknowledge Dr. Peetz' continually monitoring and recording vitals within normal limits throughout the procedure. ECF No. 68 at 9. Plaintiff's experts *did* acknowledge the normal vitals Dr. Peetz recorded, however—they just rejected them. *See* ECF No. 65-4 at 4 ("In my opinion, there is no way that the vital signs Dr. Peetz recorded are accurate."). A jury could do the same. There is also more than proof of a bad result here. There is a bad result which three experts agree would not have occurred had the anesthesia devices worked properly and had every healthcare professional done their job well. I will not assume that plaintiff's vitals were normal just because the monitor and Dr. Peetz purportedly recorded them that way.

At this stage of litigation plaintiff must establish causation for its claim against Highline "beyond mere possibility or speculation." *Kaiser*, 741 P.2d at 719. Plaintiff has met this burden. The Court draws the reasonable inference that if the anesthesia monitor were not functioning properly, Highline's alleged failure to ensure its proper functioning would be a but for cause of plaintiff's harm. Because there are genuine factual disputes as to both causation and breach, summary judgment is inappropriate. The Court therefore DENIES defendant Highline's motion.

### B.  Plaintiff's motion for spoliation sanctions

Mr. Fahrenbruch moves for sanctions against both Dr. Peetz and Highline for allegedly destroying evidence he believes is important to this case. He points to four sets of evidence purportedly spoliated by defendants: (1) intraoperative monitoring data from the Mindray

anesthesia devices and Zoll defibrillator; (2) Nurse Krull's handwritten notes from plaintiff's code event; (3) quarterly testing machine data; and (4) the identity of the medical student involved in responding to plaintiff's code. ECF No. 61 at 12. Plaintiff asks this Court to impose the sanctions, including striking defendants' affirmative defenses, precluding defendants and their witnesses from testifying about vasovagal syncope (fainting), and giving the jury an adverse inference instruction on spoliation. *Id.* at 14. After reviewing the evidence and the parties' arguments, I conclude that sanctions are not warranted.

"'Spoliation is the destruction or significant alteration of evidence, or failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.'" *Blangsted v. Snowmass-Wildcat Fire Prot. Dist.*, 642 F. Supp. 2d 1250, 1259–60 (D. Colo. 2009) (quoting *Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.*, 473 F.3d 450, 457 (2nd Cir. 2007)). A court has inherent power and authority under Fed. R. Civ. P. 37(b)(2) to sanction a litigant for the destruction or loss of evidence. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43–45, (1991). A court must first determine whether the evidence "would be relevant to an issue at trial." *Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.*, 244 F.R.D. 614, 621 (D. Colo. 2007). If so, sanctions are appropriate when (1) a party had a duty to preserve the evidence because it knew, or should have known, that litigation was imminent, and (2) the other party was prejudiced by the destruction of the evidence. *Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1149 (10th Cir. 2009).

Fed. R. Civ. P. 37(e) lays out a similar but slightly different rule for electronically stored information ("ESI"). It reads

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it,

20

and it cannot be restored or replaced through additional discovery, the court:
> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>> (A) presume that the lost information was unfavorable to the party;
>> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
>> (C) dismiss the action or enter a default judgment.

As a threshold matter, I find that two of the four sets of evidence are relevant to this case. Relevance is a low bar to pass. The intraoperative monitoring data from the anesthesia devices could confirm whether the vital numbers Dr. Peetz handwrote on the anesthesia record actually match the digital records. They could also show plaintiff's vitals with greater granularity, thus providing insight into when his oxygen levels began to drop and his cardiac arrest occurred. Nurse Krull's code notes and the defibrillator monitoring data would similarly be helpful in triangulating vitals data across the various sources. Additionally, they could go to damages by showing the exact amount of time that plaintiff was without a pulse before he was revived.

As for the quarterly testing data and the medical student's identity, the Court does not consider these in its spoliation analysis. It appears to be undisputed that testing of the anesthesia devices happened less than quarterly, and that Highline has turned over all its Mindray maintenance test results. Plaintiff himself says in his facts that Highline did not test the equipment every three months. ECF No. 61 at 5, ¶29b. Thus, because quarterly testing data does not exist, it cannot have been spoliated. The Court further finds that the identity of the medical student would not be relevant to this case. While he or she may have helped with CPR, as Nurse Roth testified, nothing in the record suggests the medical student was in the room during the procedure or would have any insight into the anesthesia devices' malfunctioning, Dr.

Peetz's committing error, or how long plaintiff was without oxygen or in cardiac arrest. The Court thus analyzes spoliation only with respect to the intraoperative monitoring data and Nurse Krull's handwritten code notes.

The parties dispute whether Highline and/or Dr. Peetz had a duty to preserve and should have preserved the evidence in question here, particularly the Mindray data. The duty to preserve is triggered by commencement of litigation or where a defendant reasonably anticipates litigation. *Cache La Poudre*, 244 F.R.D. at 621. "The analysis of when litigation was 'reasonably foreseeable' is 'a flexible fact-specific standard that allows a district court to exercise the discretion necessary to confront the myriad factual situations inherent in the spoliation inquiry.'" *Warembourg v. Excel Elec., Inc.*, 471 P.3d 1213, 1225 (Colo. App. 2020) (quoting *Micron Tech., Inc. v. Rambus Inc.*, 645 F.3d 1311, 1320 (Fed. Cir. 2011)).

Though it is a close call, I conclude that both defendants had a duty to preserve the digital records from the Mindray anesthesia devices. Dr. Peetz testified that "[w]hen we removed the drapes, we had a suspicion an event had occurred, and we confirmed that when he was placed on his back." ECF No. 61-4 at 32:7-9. Thus, within seconds of finishing the procedure he was aware that something had gone wrong. The high prevalence of medical malpractice actions in the healthcare industry, combined with the unusual circumstance of a patient being completely ashen with no pulse at the end of a procedure despite his vitals being normal, would have notified a physician that an error had likely occurred. This in turn would make litigation reasonably foreseeable. Defendant Peetz's argument that he had no duty because he did not own the devices and was not responsible for their maintenance is unavailing. Ownership of the machine that produces the lost data is not a requirement for spoliation sanctions, and in any case,

he was solely in control of the devices during the procedure. That Dr. Peetz himself returned to the OR to retrieve the anesthesia monitor's digital data further supports my conclusion.

Highline similarly had a duty to preserve the anesthesia device data. Some of its staff such as Nurse Krull were involved in the August 11, 2017 procedure and would also have realized that something went wrong. Other Highline employees such as Nurses Hyde and Hopkins helped respond to plaintiff's code and would likely also have known that an error occurred and that preserving records would be important. Again, given the unusual scenario of plaintiff's coding event and the frequency with which hospitals and healthcare professionals get sued when procedures go wrong, Highline staff should reasonably have anticipated a lawsuit and the resultant need to preserve evidence.

Though they are less important to the issues in this case, I come to the same conclusion with respect to Nurse Krull's handwritten notes and the data from the Zoll defibrillator. Both defendants should have preserved that evidence in anticipation of a lawsuit. Nurse Kirchner's testimony that she would have saved the handwritten notes to the patient's chart supports the conclusion with respect to Nurse Krull's data, even if Nurse Hyde indicates that she transferred that data to the code sheet faithfully. ECF No. 66-7 at 43:18–44:3.

Having found a duty to preserve the lost evidence, I turn to whether plaintiff has suffered prejudice, and, with respect to the intraoperative monitoring data, whether the parties failed to take reasonable steps to preserve it and whether it can be restored or replaced. The question of prejudice largely tracks with my analysis on relevance. For prejudice "[t]he burden is on the aggrieved party to establish a reasonable possibility, based on concrete evidence rather than a fertile imagination that access to the lost material would have produced evidence favorable to his

cause." *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 167 F.R.D. 90, 104 (D. Colo. 1996).

Here Mr. Fahrenbruch has established more than a reasonable possibility that the lost material would be helpful to his claims. The Mindray monitoring data in particular would show what plaintiff's vitals were digitally recorded to be—if they were normal, that would suggest a malfunctioning on the machine's part and thus potential negligence by Highline. If they were abnormal, that would suggest negligence or deceit by Dr. Peetz in setting the alarm parameters or recording the data. The information lost after the code event (from Nurse Krull's notes and the defibrillator) could confirm the exact time plaintiff was pulseless and without oxygen before resuscitation, and thus they could help prove the extent of his damages.

Ultimately though, even considering this prejudice, I conclude that sanctions are not warranted against either defendant. I cannot find that either party failed to take reasonable steps to preserve the data, as required for sanctions under Fed. R. Civ. P. 37(e). Dr. Peetz attempted to retrieve the Mindray data, but the machine had been turned off and the data lost by the time he returned to the OR. He was not the one to shut down the machines. He could not have been expected to preserve the data before then—he was focused on saving plaintiff's life, unquestionably the higher priority. Nor do we know who did turn the machines off, so the failure to preserve cannot be attributed to Highline either. Nothing in the record indicates that a Highline employee versus someone else in the building was at fault, and I cannot assume a Highline employee was responsible merely because plaintiff claims so, especially since Dr. Peetz controlled the machines during the surgery.

Even considering the more general spoliation standard, sanctions are not appropriate. The sanctions Mr. Fahrenbruch seeks—an adverse inference, exclusion of testimony, and

rejection of affirmative defenses—are the type severe enough to require more than just inadvertent loss of evidence.  For example, "[i]f the aggrieved party seeks an adverse inference to remedy the spoliation, it must also prove bad faith."  *Turner*, 563 F.3d at 1149.  "Mere negligence in losing or destroying records is not enough because it does not support an inference of consciousness of a bad case."  *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1407 (10th Cir. 1997) (citation omitted).  There is no indication that either party was at fault for this loss of data, much less indication of the intent or bad faith required for an adverse inference.  The exclusion of testimony and non-use of affirmative defenses are likewise improper since defendants' conduct regarding the lost data does not rise even to the level of negligence.  The Court therefore DENIES plaintiff's motion for sanctions.

## ORDER

1.  Defendant Highline's motion for summary judgment [ECF No. 62] is DENIED.

2.  Plaintiff's motion for spoliation sanctions [ECF No. 61] is also DENIED.

DATED this 22nd day of June, 2021.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge